UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Malunda David Gilberto Destino

v.                                          Civil no. 1:25-cv-374-SE-AJ
                                            Opinion No. 2025 DNH 149
FCI Berlin, Warden, et al.

O R D E R

Malunda David Gilberto Destino petitions this court under 28 U.S.C. § 2241 for an order

directing the respondents, various federal officials, to provide him with an individualized bond

hearing in Immigration Court. The respondents oppose the petition, arguing that Destino is

mandatorily detained pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii). Because the circumstances of

Destino's detention violate his rights under the Due Process Clause of the Fifth Amendment, the

court grants the petition.

Background[1]

Destino is a citizen of Angola who entered the United States by crossing the border near

El Paso, Texas in September 2022. Destino "indicated an intention to apply for asylum . . . or a

fear of persecution," § 1225(b)(1)(A)(ii), so an immigration officer referred him for a credible

---

[1] The following facts are drawn from the allegations in Destino's original petition and amended petition, both of which are verified as required by 28 U.S.C. § 2242. Doc no. 1; doc. no. 6. The amended petition incorporates all allegations in the original petition. Doc. no. 6 at 2. Unless otherwise noted, the facts that Destino alleges are corroborated by a declaration from a federal agent with knowledge of the respondents' operations and Destino's immigration history. Doc. no. 3–1.

fear interview pursuant to § 1225(b)(1)(B). At that interview, an asylum officer made a positive credible fear determination, entitling Destino to "further consideration of [his] application for asylum." § 1225(b)(1)(B)(ii).

Although § 1225(b)(1)(B)(ii) states that noncitizens in Destino's position "shall be detained," the respondents released Destino from detention after three days pursuant to a discretionary grant of parole under 8 U.S.C. § 1182(d)(5). On October 6, 2022, the government executed an "Interim Notice Authorizing Parole" that expired by its own terms after one year. Doc. no. 8-1.

In August 2023, an immigration judge (IJ) denied Destino's applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).[2] Destino timely appealed to the Board of Immigration Appeals (BIA). After Destino's parole status expired on October 6, 2023, the government took no action to re-detain him. Doc. no. 6 at 2. The government filed its responsive brief with the BIA on October 31, 2025, but the appeal remains pending.

For nearly two years after his parole expired, Destino lived freely in the country. He "appeared for all scheduled interviews, hearings, and related appointments" with immigration officials. Doc. no. 1 at 2. On August 20, 2025, federal agents arrested him during a field operation. They surveilled him at his home, followed him to a gas station in Scarborough, Maine, physically pulled him out of his vehicle, and arrested him. Following his arrest, the respondents detained Destino at the Federal Correctional Institution, Berlin (FCI Berlin). Doc. no. 1 at 2. They later transferred him to Strafford County Department of Corrections in Dover, New

---

[2] 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A) (asylum); id. § 1231(b)(3) (statutory withholding); 8 C.F.R §§ 208.16(c), 208.17(a) (CAT).

Hampshire.

Destino's fiancée is an asylee awaiting lawful permanent resident status. Doc. no. 1 at 5. Around a month into Destino's detention, on September 16, 2025, she gave birth to their son.

Destino alleges that he has "no criminal record." Doc. no. 1 at 2; doc. no. 6 at 5. The respondents furnished a declaration describing several traffic infractions, three of which allegedly resulted in court judgments against Destino. Id. Nowhere in their briefing, however, do the respondents assert that Destino is detained pursuant to 8 U.S.C. § 1226(c).[3] Nor would Destino's traffic infractions appear to satisfy the statute's requirements. Rather, the respondents argue exclusively that Destino is mandatorily detained under § 1225(b)(1)(B)(ii).

At some point during his detention, Destino "was refused a substantive bond hearing before the [Executive Office for Immigration Review (EOIR)] on jurisdictional grounds pursuant to the recent [BIA] precedent decision Matter of Yajure-Hurtado, 29 I&N Dec. 216 (BIA 2025)." Doc. no. 6 at 2. Again, Destino's appeal regarding the denial of his applications for asylum, withholding of removal, and CAT protection remains pending. The respondents allege that "[r]esolution one way or the other is undoubtedly forthcoming." Doc. no. 3 at 14. Destino counters that the BIA's resolution of his administrative appeal will not change the circumstances of his detention, because the BIA will either sustain his appeal or dismiss it, and in the latter circumstance Destino will have the opportunity to file a Petition for Review with the First Circuit. Doc. no. 6 at 5. Alternatively, if the appeal is sustained, the BIA will likely remand to

---

[3] 8 U.S.C. § 1226(c) concerns detention of: (1) noncitizens who have committed certain serious crimes that are grounds for deportability or inadmissibility, or (2) noncitizens who have been "charged with," "arrested for," "convicted of," or "admit[ to] having committed" certain crimes of theft or violence. See Doe v. Moniz, no. 1:25-CV-12094-IT, 2025 WL 2576819, at *6 (D. Mass. Sept. 5, 2025) (discussing 1226(c), as amended by the Lakin Riley Act).

the IJ.

Destino filed his habeas petition with this court on September 28, 2025. His initial

petition alleged three claims: (1) statutory violation of § 1226(a); (2) violation of the Fourth

Amendment; and (3) violation of the Due Process Clause of the Fifth Amendment. Doc. no. 1 at

7–8. The respondents opposed the petition on October 7, 2025, arguing that Destino's detention

is required by § 1225(b)(1), and that his constitutional claims fail. Doc no. 3 at 8–14.

This court held oral argument on the original petition on October 30, 2025. At the

hearing, the court granted Destino leave to supplement his petition. On November 10, 2025,

Destino timely moved to amend and supplement his petition as to his due process claim. In the

amended petition, Destino argues that his continued detention without a bond hearing violates his

Fifth Amendment due process rights as applied. Doc. no. 6 at 1–2. He contends that the court

need not reach whether his detention is statutorily authorized by the Immigration and Nationality

Act (INA), because, as applied to him, his detention offends his due process rights.[4] Destino asks

the court to apply the three-part balancing test for procedural due process claims established in

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). See, e.g., Rincon, 2025 WL 3122784, at *7–10.

On December 1, 2025, the respondents opposed Destino's amended petition on two

grounds: (1) Destino's detention without a bond hearing is required by statute, and (2) Destino's

detention comports with procedural and substantive due process. Doc. no. 8 at 2–3.

---

[4] Doc. no. 6 at 3 (citing Ordonez-Lopez v. U.S. Department of Homeland Security, no. EP-25-CV-470-KC, 2025 WL 3123828, at *3 (W.D. Tex. Nov. 7, 2025) (citing Erazo Rojas v. Noem, no. EP-25-CV-443-KC, 2025 WL 3038262, at *2 (W.D. Tex. Oct. 30, 2025)); E.V. v. Raycraft, no. 4:25-CV-2069, 2025 WL 3122837, at *10 (N.D. Ohio Nov. 7, 2025); Velasques Rincon v. Hyde, no. CV 25-12633-BEM, 2025 WL 3122784, at *6–7 (D. Mass. Nov. 7, 2025)).

4

<u>Discussion</u>

Section 2241 grants district courts jurisdiction to hear habeas corpus challenges to the legality of noncitizens' detentions in federal custody. <u>Rasul v. Bush</u>, 542 U.S. 466, 483–84 (2004); <u>Zadvydas v. Davis</u>, 533 U.S. 678, 687 (2001) ("We note at the outset that the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases." (citing 28 U.S.C. § 2241(c)(3))). "The burden of proof of showing deprivation of rights leading to unlawful detention is on the petitioner." <u>Espinoza v. Sabol</u>, 558 F.3d 83, 89 (1st Cir. 2009).

For the reasons explained below, the court finds that Destino's detention violates his due process rights as applied. Therefore, the court does not reach the statutory and Fourth Amendment claims alleged in the original petition. The court assumes without deciding that Destino's detention is legally mandated by § 1225(b)(1), but does not reach the respondents' statutory argument because it finds that Destino's detention without a bond hearing offends the Due Process Clause regardless of whether the INA authorizes or mandates it.[5]

---

[5] A heading in the respondents' second objection states that the amended petition does not present any new or additional evidence. Doc. no. 8 at 2. To the extent that the respondents intended to argue that the amended petition is not properly before the court, the court disagrees. A petition for writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Destino's amended petition was timely filed and specifically authorized by the court at its October 30th hearing. Doc. no. 6; <u>see also</u> doc. no. 1 at 5 (reserving the right to amend and/or supplement). Further, the respondents admit that "[s]ubsequent to the hearing on October 30, 2025, undersigned counsel confirmed with [Immigration and Customs Enforcement (ICE)] that [Destino's] release in October 2022 was pursuant to [the Department of Homeland Security's (DHS)] discretionary parole authority." Doc. no. 8 at 2. Moreover, the original petition asserted the due process claim that is further developed in the amended petition and is the basis of the court's order. Doc. no. 1 at 8–9; Doc. no. 3 at. 11–14.

I.    Destino's Due Process Challenge to his Detention is Cognizable

The respondents are incorrect that Destino's as-applied due process challenge is foreclosed by Supreme Court and First Circuit precedent. In their opposition to Destino's due process claim, the respondents do not directly address the Mathews test or otherwise balance the interests set forth by Destino. Instead, they argue broadly that Destino "is being provided procedural due process." Doc. no. 8 at 3. Relying primarily on two Supreme Court cases, the respondents argue that this court should "apply the 'century old rule' that [Destino's] procedural due process rights are coextensive with the rights provided him under statute and regulation." Id. at 7; Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953); Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 140 (2020). As Destino points out, however, this argument mistakenly conflates precedents expounding the executive's power to admit or exclude noncitizens with the constitutional limits on detentions without bond hearings. Doc. no. 6 at 3 (citing Ordonez-Lopez, 2025 WL 3123828, at *3; E.V., 2025 WL 3122837, at *10); see also Lopez-Arevelo v. Ripa, no. EP-25-CV-337-KC, 2025 WL 2691828, at *8 (W.D. Tex. Sept. 22, 2025).

In fact, the Supreme Court has expressly left open whether due process safeguards apply to a noncitizen's detention while removal proceedings are ongoing. See Jennings v. Rodriguez, 583 U.S. 281, 312 (2018); see also Johnson v. Arteaga-Martinez, 596 U.S. 573, 583 (2022) ("The Government also notes that as-applied constitutional challenges remain available to address 'exceptional' cases."). Further, the First Circuit has made clear that immigration detentions must comport with the Due Process Clause. Hernandez-Lara v. Lyons, 10 F.4th 19, 41 (1st Cir. 2021).

The court recognizes that the Supreme Court "has long held that [a noncitizen] seeking

initial admission to the United States requests a privilege and has no constitutional rights

regarding his application, for the power to admit or exclude [noncitizens] is a sovereign

prerogative." Landon v. Plasencia, 459 U.S. 21, 32 (1982); Mezei, 345 U.S. at 212. Indeed, the

Supreme Court has stated that a noncitizen who has not "effected an entry" is entitled to "only

those rights regarding admission that Congress has provided by statute." Thuraissigiam, 591 U.S.

at 105. Nevertheless, Supreme Court precedent does not foreclose Destino's due process

challenge to the circumstances and length of his detention as applied to him for several reasons.[6]

     First and most importantly, Thuraissigiam is distinct from Destino's case because the

noncitizen there challenged the denial of his asylum claim, whereas Destino seeks release from

immigration detention. See Thuraissigiam, 591 U.S. at 107; Lopez-Arevelo, 2025 WL 2691828,

at *8; accord E.V., 2025 WL 3122837, at *10; see also Fils-Aime, 2025 WL 3063164, at *3.

Describing the limitations to the scope of habeas relief, the Supreme Court made clear that the

---

[6] This court's conclusion is in accord "with the growing consensus of district courts across the country recognizing that as-applied due process challenges to detention without a bond hearing are not foreclosed by either Thuraissigiam or Jennings." E.V., 2025 WL 3122837, at *11 (citing, e.g., Lopez-Arevelo, 2025 WL 2691828, at *7–10; Hernandez-Fernandez v. Lyons, no. 5:25-cv-773, 2025 WL 2976923, at *8 n.2 (W.D. Tex. Oct. 21, 2025); Merino v. Ripa, no. 25-23845-CIV-MARTINEZ, 2025 WL 2941609, at *4 (S.D. Fla. Oct. 15, 2025); Ochoa Ochoa v. Noem, no. 25-CV-10865, 2025 WL 2938779, at *7 (N.D. Ill. Oct. 16, 2025); Escobar-Ruiz v. Raycraft, no. 1:25-CV-1232, 2025 WL 3039255, at *6 (W.D. Mich. Oct. 31, 2025)); see also, e.g., Ordonez-Lopez, 2025 WL 3123828, at *3; Rojas, 2025 WL 3038262, at *2–3; Espinoza v. Kaiser, no. 1:25-CV-01101 JLT SKO, 2025 WL 2581185, at *10–11 (E.D. Cal. Sept. 5, 2025); Rosado v. Figueroa, no. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *12 (D. Ariz. Aug. 11, 2025); Ortega v. Bonnar, 415 F. Supp. 3d 963, 969–70 (N.D. Cal. 2019); Carillo Fernandez v. Knight, no. 2:25-CV-02221-RFB-BNW, 2025 WL 3485800, at *6 (D. Nev. Dec. 4, 2025); Garcia-Arauz v. Noem, no. 2:25-CV-02117-RFB-EJY, 2025 WL 3470902, at *6–7 (D. Nev. Dec. 3, 2025); Silva Hernandez v. Noem, no. 2:25-CV-02304-RFB-EJY, 2025 WL 3470903, at *8 (D. Nev. Dec. 3, 2025); Avila Aranda v. Olson, no. 4:25-CV-00156-GNS, 2025 WL 3499061, at *6–8 (W.D. Ky. Dec. 5, 2025); Doe v. Moniz, 2025 WL 2576819, at *11; Rincon, 2025 WL 3122784, at *5–7; Fils-Aime v. FCI Berlin, Warden, No. 1:25-CV-287-JL-TSM, 2025 WL 3063164, at *3 (D.N.H. Oct. 31, 2025); Tenemasa-Lema v. Hyde, No. CV 25-13029-BEM, 2025 WL 3280555, at *4 (D. Mass. Nov. 25, 2025).

federal habeas statute at its core permits challenges to unlawful detention, but it "cannot provide another 'opportunity to remain lawfully in the United States.'" Thuraissigiam, 591 U.S. at 107; see also Trump v. J. G. G., 604 U.S. 670, 672 (2025).

It was against this backdrop that the Supreme Court rejected Thuraissigiam's due process claim and held that a noncitizen in his "position has only those rights regarding admission that Congress has provided by statute." Id. at 140. But the Supreme Court plainly did not proscribe as-applied due process challenges by immigration detainees. See id. at 117–18. Rather, it specifically distinguished Thuraissigiam's attempt to "obtain additional administrative review of his asylum claim" from due process claims seeking to "secure *release* from unlawful detention." Thuraissigiam, 591 U.S. at 107. Here, Destino seeks release from detention. Whereas Thuraissigiam's negative credible fear determination meant he was "subject to immediate removal and deportation thereafter," Lopez-Arevelo, 2025 WL 2691828, at *8, Destino challenges his months-long detention while he awaits final adjudication of his asylum claim.

Second, Thuraissigiam's holding hinged on the location of the noncitizen at the time of his arrest, as opposed to his immigration status (*e.g.*, whether he was an "applicant for admission," or had lawful status). Thuraissigiam had "attempted to enter the country illegally and was apprehended just 25 yards from the border," so had "no entitlement to procedural rights other than those afforded by statute." Thuraissigiam, 591 U.S. at 107. Because he was so close to the border at the time of his arrest, Thuraissigiam was, in the Supreme Court's view, not yet in the country and instead effectively attempting to enter the country at the border. Consequently, his procedural rights were not of constitutional magnitude and were conferred only by the INA. Destino, by contrast, was detained while stopping for gas in Maine after years of lawful presence, rendering him distinctly unlike a person whose most recent arrest occurred at (or yards

past) a port of entry.

The distinction between the due process rights of a person attempting to enter the country and another who is already living within it is confirmed by <u>Mezei</u>, another case pressed by the respondents. 345 U.S. at 208. There, Mezei, a lawful permanent resident who had lived in New York for decades, travelled abroad and lived in Hungary for nineteen months. <u>Id.</u> Upon his return, he was excluded from the United States based on the government's conclusion that he was a "danger to the national security." <u>Id.</u> at 208, 216. After spending twenty-one months in detention on Ellis Island, Mezei sought relief through habeas corpus. <u>Id.</u> at 209.

The Supreme Court rejected Mezei's due process claim, highlighting again the distinction between noncitizens arrested at or near the border while entering the country and those arrested within the country. The decision recognized that noncitizens "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to . . . due process of law." <u>Id.</u> at 212. "But [a noncitizen] on the threshold of initial entry stands on different footing: Whatever the procedure authorized by Congress is, it is due process as far as [a noncitizen] denied entry is concerned." <u>Id.</u> The Supreme Court concluded that neither Mezei's "harborage on Ellis Island nor his prior residence here transforms this into something other than an exclusion proceeding" because "harborage at Ellis Island is not an entry into the United States." <u>Id.</u> at 213.

In other words, it was Mezei's location, or, stated differently, his condition of having been denied initial entry into the United States, that placed him outside the reach of due process protections beyond what the immigration statutes provided. As the Supreme Court recognized in <u>Zadvydas</u>, it was essential to the <u>Mezei</u> Court's reasoning that the noncitizen's "extended departure from the United States required him to seek entry into this country once again." 533 U.S. at 693 (quoting <u>Mezei</u>, 345 U.S. at 213, 215); <u>see also</u> <u>Amanullah v. Nelson</u>, 811 F.2d 1, 9

(1st Cir. 1987) (rejecting a due process claim brought by noncitizens who were detained at ports of entry but recognizing that "outside the context of admission and exclusion procedures, excludable [noncitizens] do have due process rights"). Because Mezei stood "on the threshold of initial entry," neither his prior residence in the country nor his prolonged detention triggered due process protections beyond those provided by immigration statutes. Mezei, 345 U.S. at 212–13.[7]

Here, by contrast, Destino lived within the United States for nearly three years and was well within our country's borders when his most recent arrest occurred. He is therefore protected by the Constitution and may challenge his detention without a bond hearing on due process grounds. See United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990) (recognizing that noncitizens "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); Thuraissigiam, 591 U.S. at 107 (acknowledging that noncitizens "who have established connections in this country have due process rights in deportation proceedings"); Tenemasa-Lema, 2025 WL 3280555, at *4 ("Indeed, the Supreme Court has previously recognized that a non-citizen's 'ties' to this country can inform the substance of their constitutional protections, even in the absence of strict physical presence." (citing Plasencia, 459 U.S. at 32–34)).

To be sure, it gives the court pause that the Supreme Court stated in Thuraissigiam that noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" 591 U.S.

---

[7] But see Plasencia, 459 U.S. at 34 ("We did not suggest [in Mezei] that no returning resident [noncitizen] has a right to due process, for we explicitly affirmed Chew."); see also Chew v. Colding, 344 U.S. 590, 596 (1953) (holding that a permanent resident noncitizen returning from a five-month voyage as a crewman on an American ship had the same due process rights as "that of [a noncitizen] continuously residing and physically present in the United States").

at 139 (citing <u>Mezei</u>, 345 U.S. at 215; <u>Leng May Ma v. Barber</u>, 357 U.S. 185, 188–90 (1958);

<u>Kaplan v. Tod</u>, 267 U.S. 228, 230–31 (1925)). But on closer examination, that single sentence

does not affect the court's analysis in this case.

As an initial matter, <u>Thuraissigiam</u>, and the cases upon which it relied for this

proposition, <u>Mezei</u>, <u>Leng May Ma</u>, and <u>Kaplan</u>, are factually distinguishable in relevant ways.

Neither Thuraissigiam nor Mezei was paroled into the United States during the pendency of their

respective removal and exclusion proceedings. Rather, the government detained both noncitizens

at ports of entry. So, those cases did not provide the Supreme Court an occasion to consider an

accrued liberty interest conferring due process protections. <u>See</u> <u>Lopez-Arevelo</u>, 2025 WL

2691828, at *9 ("While Thuraissigiam saw little of this country beyond his jail cell at the border,

Lopez-Arevelo has built a life here."); <u>Mezei</u>, 345 U.S. at 213 ("[H]arborage at Ellis Island is not

an entry into the United States.").

Although <u>Leng May Ma</u> and <u>Kaplan</u> involved noncitizens who had been paroled, those

cases did not hold that a noncitizen's parole status somehow bars him from acquiring

constitutional rights. Rather, <u>Leng May Ma</u> and <u>Kaplan</u> held that temporary parole into the

United States did not grant noncitizens particular rights under statutory immigration laws. 357

U.S. at 186; 267 U.S. at 230–31.[8] As such, those cases do not disrupt the notion that

---

[8] In <u>Kaplan</u>, the noncitizen parolee argued that she "became a citizen by the naturalization of her father while she was a minor and in [the] country." 267 U.S. at 230. But by statute, "[n]aturalization of parents affect[ed] minor children only 'if dwelling in the United States,'" and despite her temporary parole to her father's house, the court held that the noncitizen had never been "dwelling in the United States within the meaning of the Act." <u>Id.</u> The court therefore did not consider whether the noncitizen had acquired a liberty interest conferring due process rights while she was briefly paroled into the country. <u>Id.</u> at 230–31.

Similarly, in <u>Leng May Ma</u>, the noncitizen sought relief under a provision of the INA that authorized "the Attorney General 'to withhold deportation of any [noncitizen] within the United States to any country" where she "would be subject to physical persecution." 357 U.S. at 185.

"constitutional due-process protections regarding detention flow simply as a matter of 'geographic' presence within the United States, . . . notwithstanding any legal fiction that might affect a non-citizen's 'rights regarding admission.'" See Tenemasa-Lema, 2025 WL 3280555, at *4 (quotations omitted).

Thuraissigiam, Mezei, Leng May Ma, and Kaplan each involved challenges to decisions regarding admission, exclusion, and removal. Their consideration of the requirements of due process was thus constrained by the Supreme Court's respect for the executive's sovereign prerogative of governing admission to the country and the Court's conclusion that, in that context, the Due Process Clause requires nothing more than those rights provided by statute. See Thuraissigiam, 591 U.S. at 139–40. Because the distinction between noncitizens inside and those outside the United States is frequently determinative under immigration statutes, it makes sense that the so-called "entry fiction" is sometimes necessary to preserve the "sovereign prerogative." Id.; see also Mezei, 345 U.S. at 215 (noting that the Supreme Court has considered "temporary arrangements" such as temporary harborage for sailors "as not affecting [a noncitizen's] status; he is treated as if stopped at the border").

Certainly, Thuraissigiam and Mezei employed an entry fiction to reject due process claims. But as recognized in Rincon, "granting the relief requested in Mezei or Thuraissigiam— initial entrance to the United States (Mezei) or a more robust process toward admission (Thuraissigiam)—might have genuinely undermined the sovereign prerogative of governing admission to this country." 2025 WL 3122784, at *7 (quotations and alterations omitted). By

_____

The Court concluded that the noncitizen's "parole did not alter her status as an excluded [noncitizen] or otherwise bring her 'within the United States' in the meaning of [the INA]." Id. at 186.

contrast, "[w]hile detention pending removal proceedings certainly constitutes an 'aspect of the deportation process,' it only collaterally implicates Congress's 'sovereign prerogative . . . to decide which [noncitizens] to admit.'" Id. at *6 (quoting Demore v. Kim, 538 U.S. 510, 523 (2003); Thuraissigiam, 591 U.S. at 139) (emphasis omitted). Here, the respondents ask this court to fashion a legal fiction in a context never adopted by the Supreme Court and unnecessary under its prior reasoning.

In non-admission contexts, which do not directly implicate the executive's sovereign prerogative, the Due Process Clause protects liberty interests that may accrue regardless of statutory allowances. Liberty interests may spring from lives lived, connections fostered, and promises made or implied. "Thus, even without disturbing the metaphysical 'entry fiction' that may obstruct, in some senses, our ability to admit that a non-citizen is really 'here,' one can still constitutionally recognize [a petitioner's] actual life in this country—his years as part of our community—not so easily set aside." Tenemasa-Lema, 2025 WL 3280555, at *4. While noncitizens paroled into the country for years may not be "admitted" within the meaning of the INA, they have lived at liberty here, and so may acquire the protection of the Constitution, at least insofar as it protects against detentions without bond hearings. See id.

The respondents' argument based on the parole statute suffers from a similar infirmity. To limit Destino's due process rights regarding his detention, the respondents seek to merge Destino's 2022 entry at the Texas border into his 2025 arrest in Maine by operation of § 1182(d)(5). The respondents rely on the statute's provision that "parole . . . shall not be regarded as an admission of the [noncitizen] and when the purposes of . . . parole . . . have been served[,] the [noncitizen] shall forthwith . . . be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other

13

applicant for admission to the United States." <u>See</u> Doc. no. 3 at 11–12 (quoting § 1182(d)(5)). As the respondents see it, despite Destino's presence at liberty in the country for almost three years, the court should treat him as if he has not yet physically entered the United States. But again, the parole statute is concerned with Destino's status as an "applicant for admission," a status relevant to his admission, exclusion, or removal. As a matter of constitutional due process, the court interprets the statute to control Destino's status only in this respect and not with respect to detention, consistent with the court's understanding of the limitations of the Supreme Court's statement in <u>Thuraissigiam</u> that paroled noncitizens are treated as if stopped at the border.

In the context of Destino's due process claim challenging his detention, then, the parole statute does not supplant the facts. Destino's most recent arrest and detention occurred at a gas station in Maine and not at the border upon entry. As Judge Murphy put it:

> Petitioner was not 25 yards over the border; nor was he maintained in an immigration processing center. Petitioner lived with relative freedom in the United States for nearly four years, finding his way across the country from Texas to Massachusetts. To claim that Petitioner was never really 'here' thus requires a much greater sleight of hand than is provided for in [<u>Mezei</u> and <u>Thuraissigiam</u>].

> That lawful fib is made all the more suspect by the rights that it effectively withdraws. It is well-settled that the Due Process Clause grants protection to 'all persons within the territory of the United States.' Thus, to erase Petitioner's presence in this country is, in essence, to erase his rights. In the case of revoked parole into the United States, that may happen by operation of statute. But '[l]egislation cannot detract from the privilege afforded by the constitution.'

<u>Rincon</u>, 2025 WL 3122784, at *6 (citations and alterations omitted). So too here.

Third, even if <u>Mezei</u> were controlling in the case of a parolee arrested inside the United States who seeks a bond hearing, it can be read only for the narrow proposition it sets forth. There, the "exclusion proceeding [was] grounded on danger to the national security." <u>Mezei</u> at 216. That the government determined Mezei to be a national security threat "present[ed]

14

different considerations" than those underlying a process that permitted noncitizens "uprooted from our midst [to] rejoin the community until the [g]overnment [deports them]." Id. at 216–17.

While Mezei appears to permit the government to detain a noncitizen at a port of entry for a prolonged period after he is found to be a national security threat, that rule is consistent with other circumstances in which the Supreme Court has permitted categorical rather than individualized custody determinations about certain groups of noncitizens. In Demore, 538 U.S. at 528–31, the Supreme Court upheld as constitutional § 1226(c)'s requirement of detention without bond for noncitizens convicted of certain serious crimes. The Supreme Court specifically reasoned that Congress had relied on evidence indicating that such noncitizens, as a class, were likely to abscond or reoffend. Hernandez-Lara, 10 F.4th at 35–36 (citing Demore, 538 U.S. at 528).[9] Mezei does not justify Destino's continued detention without a hearing.

Fourth and finally, in Hernandez-Lara, the First Circuit recognized that the Supreme Court in Jennings v. Rodriguez "left for another day . . . the constitutional question" of whether the Due Process Clause entitles noncitizens detained pursuant to § 1226(a) to a bond hearing at which the government bears the burden of proof to justify their continued detention. 10 F.4th at 27 (citing 583 U.S. at 312). The First Circuit, faced with the due process question left open in Jennings, held that its inquiry was "guided by the three-part balancing test articulated in Mathews v. Eldridge." Id. (citing 424 U.S. 319). After applying the Mathews balancing test, the court held that "in order to continue detaining [the petitioner] under section 1226(a), due process

---

[9] Likewise, in Carlson v. Landon, 342 U.S. 524, 538 (1952), the Court upheld the detention of noncitizens accused of Communist activities by relying on Congressional findings regarding the dangers of Communism. See Hernandez-Lara, 10 F.4th at 36 (citation omitted). Indeed, Mezei himself was considered a national security threat due to alleged Communist leanings. Mezei, 345 U.S. at 227 (Jackson, J., dissenting).

15

requires the government to either (1) prove by clear and convincing evidence that she poses a danger to the community or (2) prove by a preponderance of the evidence that she poses a flight risk." Id. at 41.

The court acknowledges the distinction between the issues under consideration in Hernandez-Lara and those here. Hernandez-Lara held unconstitutional the agency's policy of allocating the burden of proof to the noncitizen at a § 1226(a) bond hearing. Id. By contrast, the respondents here claim that Destino has no statutory right to a bond hearing at all under § 1225(b)(1)(B)(ii), while Destino argues that due process requires one. Despite these distinctions, however, the underlying inquiry here and in Hernandez-Lara may be reduced to the same question: Whether the government may constitutionally detain a noncitizen—who is not categorically dangerous or likely to abscond—without carrying the burden of proving any individualized need for preventative detention. See Hernandez-Lara, 10 F.4th at 35–36 (distinguishing Demore, 538 U.S. at 528). Hernandez-Lara answered that question in the negative, holding that the government must prove either dangerousness or flight risk at a bond hearing. Id. at 41.

Yes, the bond hearing in Hernandez-Lara was authorized by § 1226, and Destino is detained under § 1225, which does not provide for a bond hearing. But statutory authority or lack thereof is not relevant to the requirements imposed by the Due Process Clause in this context. On the contrary, ruling that the respondents here are constitutionally compelled to provide a hearing at which the government must prove the existence of a flight risk or dangerousness in order to justify Destino's detention is at most a logical extension of Hernandez-Lara's holding.

Because Hernandez-Lara's holding was grounded in the Constitution, the Due Process Clause requires a hearing at which the government is held to its burden regardless of whether the

16

government classifies a noncitizen as detained under § 1225 or § 1226(a). See Tenemasa-Lema, 2025 WL 3280555, at *5–7 (explaining why petitioners detained under 1225(b)(2) are practically indistinguishable from the 1226(a) petitioner in Hernandez-Lara, notwithstanding DHS's changed policy of applying § 1225 to all "applicants for admission"). Here, Destino has a due process right to an individualized bond hearing, and neither the legislature nor the executive can strip him of that right by classifying him as detained under § 1225.

Even if the court could not decide that Destino has a right to a bond hearing solely on the basis of the First Circuit's holding in Hernandez-Lara—because the First Circuit did not expressly hold that noncitizens detained under § 1225 are entitled to bond hearings to justify their continued detention—the Hernandez-Lara decision would provide the blueprint for deciding the issue. The Circuit made it clear that the Due Process Clause governs civil detentions in the immigration context, just as it would govern those involving involuntary commitments of citizens. Hernandez-Lara, 10 F.4th at 27–28 (citing Addington v. Texas, 441 U.S. 418 (1979)). It also held that the Mathews balancing test guides the application of due process principles to detentions during the pendency of removal proceedings.[10] Id. The relevant Supreme Court cases either do not address, or have explicitly reserved, the due process issue raised in this case. See, e.g., Jennings, 583 U.S. at 312. Therefore, this court is bound to follow First Circuit precedent.

II.    Mathews Balancing

The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or

---

[10] Further, the court notes that the Supreme Court has applied Mathews in the immigration context at least once. See Plasencia, 459 U.S. at 34–35.

permanent." Zadvydas, 533 U.S. at 693; see also J. G. G., 604 U.S. at 673 ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). Thus, civil detention, even in the immigration context, is permissible "only 'in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" Kong v. United States, 62 F.4th 608, 616 (1st Cir. 2023) (quoting Zadvydas, 533 U.S. at 690).

When a procedural due process violation is alleged in the immigration context, the First Circuit and other courts have repeatedly applied the three-part balancing test established in Mathews. See, e.g., Plasencia, 459 U.S. at 34 ("If the exclusion hearing is to ensure fairness, it must provide Plasencia an opportunity to present her case effectively, though at the same time it cannot impose an undue burden on the government."); Hernandez-Lara, 10 F.4th at 27–28 (holding that the government bears the burden of proof at bond hearings); Velasco Lopez v. Decker, 978 F.3d 842, 850–56 (2d Cir. 2020) ("We conclude that Velasco Lopez's prolonged incarceration, which had continued for fifteen months without an end in sight or a determination that he was a danger or flight risk, violated due process."); German Santos v. Warden Pike Cnty. Corr. Facility, 965 F.3d 203, 212–14 (3d Cir. 2020) (relying on Mathews in determining that the government must bear the burden of proof at bond hearings and applying a four-part reasonableness test in finding a noncitizen's prolonged detention in a criminal facility unreasonable).

"In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of

18

the government in using the current procedures rather than additional or different procedures." Plasencia, 459 U.S. at 34 (citing Mathews, 424 U.S. at 334–35).

### A.    Private Interest

Beginning with the first Mathews factor, the court must weigh "the private interest that will be affected by the official action." 424 U.S. at 335. Destino argues that his "personal liberty is a foundation[al] 'private interest' . . . weighing heavily in [his] favor." Doc. no. 6 at 5. The court agrees.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Hernandez-Lara, 10 F.4th at 28 (citing Zadvydas, 533 U.S. at 695 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992))) (alteration in Hernandez-Lara). "The Supreme Court has repeatedly affirmed that '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" Id. (quoting United States v. Salerno, 481 U.S. 739, 755 (1987)) (alternation in Hernandez-Lara). "For this reason, 'civil commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protections." Id. (quoting Addington, 441 U.S. at 425) (emphasis added in Hernandez-Lara).

Following the First Circuit, this court acknowledges "that removal proceedings have an end point and that the liberty interest of a [detained noncitizen] may therefore be slightly less weighty than that of individuals facing indefinite and prolonged detention." Id. at 29. But the liberty interest is "only slightly less," as the "exact length of detention" during the pendency of removal proceedings "is impossible to predict and can be quite lengthy." Id. Destino's case illustrates that point: an IJ denied his applications for relief back in 2023, but his administrative appeal remains pending before the BIA. Whatever decision the BIA renders, future proceedings

are likely to follow,[11] and Destino's detention could "continue[] until all proceedings and appeals have concluded." Id. at 30.

Courts have repeatedly recognized the substantial backlog of immigration cases awaiting administrative and judicial review. Id. (citing Pereira-Brito v. Barr, 415 F. Supp. 3d 258, 264–65 (D. Mass. 2019) (finding that between November 1, 2018 and May 7, 2019, one in four of the cases pending in the Boston and Hartford Immigration Courts lasted two years or longer); Rincon, 2025 WL 3122784, at *1 n.1 ("Individuals with an immigration court case who were ultimately granted relief such as asylum in [Fiscal Year] 2024 waited more than 1,283 days on average for that outcome." (citations omitted)); Tenemasa-Lema, 2025 WL 3280555, at *9 (citing data "showing that as of August 2025, there were 3,432,519 active cases pending in the immigration courts" (citation omitted)).

Here, the respondents have detained Destino since August 20, 2025. Absent intervention by this court, they could continue detaining him for months or even years while his removal order remains nonfinal. Destino need not languish in prison for some prolonged period, away from his fiancée and infant son, waiting for his due process rights to kick in. Accord Tenemasa-Lema, 2025 WL 3280555, at *9 ("[D]isruption of established family ties further compounds Petitioner's deprivation of liberty."). The court agrees that the stakes are as described by Judge Murphy in Tenemasa-Lema:

> We could all stand to pause for a moment and consider what it would mean, personally, to be separated from our families. Now, discount that loss by however much you think Petitioner's immigration status makes it actually not that big of a

---

[11] "An order of removal becomes final at the earlier of two points: (1) 'a determination by the [BIA] affirming such order,' or (2) 'the expiration of the period in which the [noncitizen] is permitted to' petition the BIA for review of the order." Riley v. Bondi, 606 U.S. 259, 267 (2025) (quoting 8 U.S.C. § 1101(a)(47)(B)). "Under 8 U.S.C. § 1252(b)(1), a petition for [judicial] review of a 'final order of removal' must be filed within 30 days of that order." Id. at 266.

deal. The Court submits that there is no humane way to perform that calculus without concluding that Petitioner has a tremendous interest at stake here.

Id.

Indeed, with each week that Destino is detained without an individualized bond hearing, he unquestionably suffers a "substantial deprivation of liberty." Hernandez-Lara, 10 F.4th at 28. Since his most recent civil immigration arrest, Destino, who has a minor, nonviolent criminal history, has been "incarcerated alongside criminal inmates," first at FCI Berlin, and now at Strafford County Department of Corrections. See id. As in Hernandez-Lara, Destino has been "separated from [his] fiancée and unable to maintain [his] employment." Id. Worse yet, Destino has been detained since August 20, 2025, over four months, and the entirety of his son's life.

As the Supreme Court recognized in Plasencia, noncitizens with established ties to this country have a "weighty" liberty interest, as they "stand[] to lose the right to 'stay and live and work in this land of freedom,'" as well as "the right to rejoin [their] immediate famil[ies], a right that ranks high among the interests of the individual." 459 U.S. at 34 (citing Moore v. City of East Cleveland, 431 U.S. 494, 499 (1977) (plurality opinion); Stanley v. Illinois, 405 U.S. 645, 651 (1972)) (additional quotation omitted). Destino's liberty interests in working in the United States, living alongside his fiancée and infant child, and avoiding conditions of confinement meant for criminals are themselves sufficiently weighty to require due process protection.

The court further finds that the liberty interest in this case is particularly strong because Destino was previously paroled into the country for nearly three years. Courts have repeatedly recognized that "an individual already enjoying certain forms of conditional release has a protected liberty interest in retaining them." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 886 (1st Cir. 2010). In Morrissey v. Brewer, the Supreme Court held that the Due Process Clause protects

a liberty interest in parole. 408 U.S. 471, 482 (1972). Once a prisoner is granted the status of

parolee, he enjoys a liberty interest "unlike the minimal liberties of those who reside behind

prison walls." Gonzalez-Fuentes, 607 F.3d at 886. The parolee "relie[s] on at least an implicit

promise that parole will be revoked only if he fails to live up to the parole conditions." Id. at 887

(quoting Morrissey, 408 U.S. at 482). "Subject to the conditions of his parole, [a parolee] can be

gainfully employed and is free to be with family and friends and to form the other enduring

attachments of normal life." Id. at 886–87 (quotation omitted).

Cases recognizing the heightened liberty interests of parolees are instructive here, where

Destino was involved in pending immigration proceedings but free in the community for nearly

three years prior to his most recent arrest. During that time, Destino alleges that he worked,

settled in Maine, and started a family with his fiancée. Doc. no. 1 at 1, 9. The court does not

doubt that Destino has developed ties to his community while maintaining a stable address in

Maine. Although Destino's 2022 grant of parole was set to expire after one year, the respondents

did not detain him until 2025. Like a criminal parolee, Destino and his fiancée have since relied

on "an implicit promise that [his] parole [would] be revoked only if he fails to live up to the

parole conditions."[12] Morrisey, 408 U.S. at 482. Because he spent nearly three years at liberty in

the United States, Destino has a cognizable interest in his freedom from detention.

The court concludes that Destino has a protectable liberty interest for two independently

---

[12] "A number of district courts have extended [the] reasoning [in parole cases] to the immigration context and held that once released from immigration custody, noncitizens acquire 'a protectable liberty interest in remaining out of custody on bond.'" Lopez-Arevelo, 2025 WL 2691828, at *11 (citing Diaz v. Kaiser, no. 25-cv-5071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025) (collecting cases); M.S.L. v. Bostock, no. 25-cv-1204, 2025 WL 2430267, at *8 (D. Or. Aug. 21, 2025); Ortega v. Bonnar, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019); Rosado v. Figueroa, no. 25-cv-2157, 2025 WL 2337099, at *12 (D. Ariz. Aug. 11, 2025)).

dispositive reasons: (1) he has a "weighty" liberty interest in working in the United States and living alongside his family, see Plasencia, 459 U.S. at 34; and (2) his liberty interest is all the stronger because he was paroled into the country for three years, during which time he accrued an expectancy interest that he would be re-detained only if he violated the conditions of his release, see Morrisey, 408 U.S. at 482.[13]

### B.     Risk of Erroneous Deprivation

The second Mathews consideration is "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. Destino argues that should his administrative appeal be sustained, or even if it should proceed to a Petition for Review before the First Circuit, "then the risk of erroneous deprivation of his liberty interest is substantial." Doc. no. 6 at 5. The court agrees.

The respondents have denied Destino any process whatsoever relative to his custody status. At some point during his detention, Destino "was refused a substantive bond hearing before the EOIR on jurisdictional grounds pursuant to the recent [BIA] precedent decision Matter of Yajure-Hurtado, 29 I&N Dec. 216 (BIA 2025)."[14] Doc. no. 6 at 2. Destino was thus

---

[13] The government does not argue that Destino's actions precipitated his arrest in any way. The only changed circumstance apparent from the record is the executive's changed practice of applying mandatory immigration detention. See Martinez v. Hyde, 792 F. Supp. 3d 211, 217–18 (D. Mass. 2025) ("DHS, in coordination with the Department of Justice (DOJ), has revisited its legal position on detention and release authorities." (quoting an internal policy memorandum issued by ICE)). In many cases, DHS has relied on a novel reading of § 1225 and § 1226 to justify mandatory detention. Although § 1226 and the related policy change is not at issue in this case, the court notes that DHS's novel reading is irrelevant to a noncitizen's liberty interest in a bond hearing, which is conferred by the Constitution.

[14] The record is unclear whether Destino requested release before an IJ who concluded that he or she lacked jurisdiction to hold a bond hearing; or, whether the respondents refused to bring him before an IJ at all by predetermining that the Immigration Court lacked jurisdiction.

denied a pre-deprivation hearing where he could "contest the existence, nature, or significance of [any] supervision violations" or otherwise hold the government to its burden to make an individualized showing "of the need to re-detain him." Lopez-Arevelo, 2025 WL 2691828, at *11 (quoting Espinoza, 2025 WL 2581185, at *11) (alteration in Lopez-Arevelo).

Absent a right to a bond hearing, the "only mechanism [a noncitizen detained under § 1225] has to test the propriety of his detention is DHS's discretionary authority to grant parole." Rincon, 2025 WL 3122784, at *9 (citing § 1182(d)(5)(A)). But Destino's due process rights cannot depend on a favorable exercise of discretion by the respondents. On the contrary, the risk of erroneous deprivation of Destino's liberty interest is significant because he has been denied any opportunity to be heard regarding his confinement. The risk is further heightened by the reality that it could be many months or even years until Destino's removal proceedings become final.

As for the probable value of additional procedural protections, "agency decisionmakers regularly 'conduct individualized custody determinations considering flight risk and dangerousness.'" Lopez-Arevelo, 2025 WL 2691828, at *11 (quoting Velesaca v. Decker, 458 F. Supp. 3d 224, 242 (S.D.N.Y. 2020)) (alterations in Lopez-Arevelo omitted). A bond hearing before an IJ would provide Destino "the opportunity be heard and receive a meaningful assessment of whether he is dangerous or likely to abscond," so "would greatly reduce the risk of erroneous deprivation of his liberty." Id.

Thus, the second factor also supports Destino's claim that the respondents are denying

---

See Matter of Yajure-Hurtado, 29 I&N Dec. 216 (BIA 2025). In either circumstance, the respondents have denied Destino a bond hearing on the merits of his request for conditional release.

him the process he is due.

        C.     <u>Governmental Interest</u>

The third and final factor to be balanced under <u>Mathews</u> is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The government's interest "ultimately entails an assessment of the 'public interest.'"  <u>Hernandez-Lara</u>, 10 F.4th at 32 (quotation omitted).

Destino argues that because he is not a flight risk or a danger to the public, "the Government's interest in summarily detaining him nearly three years after his initial release [is] minimal-to-non-existent." Doc. no. 6 at 5. Specifically, Destino lacks a violent criminal record, has maintained a stable address since 2022, has historically attended all Immigration Court proceedings, has complied with all ICE check-ins, and has "otherwise diligently pursu[ed] his legal claims in accordance with the applicable administrative and statutory framework." <u>Id.</u> The respondents do not counter any of Destino's arguments under <u>Mathews</u> but suffice it to say that "it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." <u>Plasencia</u>, 459 U.S. at 34. As such, the court "must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process" in the present circumstances. <u>Id.</u> at 35.

Certainly, the government "has an interest in detention insofar as it makes more likely that it will be able to execute a [final] removal order later, if one is ordered." <u>Tenemasa-Lema</u>, 2025 WL 3280555, at *10. "That interest, of course, is frustrated when an individual flees." <u>Id.</u> "But the decision to release [Destino] on his own recognizance three years ago, in and of itself,

'reflects a determination by the government that [he] is not a danger to the community or a flight risk.'" Lopez-Arevelo, 2025 WL 2691828, at *11 (quotation omitted).

Further, Destino's uncontroverted allegations regarding his years of compliance with the conditions of his release are telling. Destino attests, in his verified amended petition, that he has lived at the same address since 2022 and attended all immigration proceedings and ICE check-ins during the years prior to his detention. Doc. no. 6 at 5. Destino's role as a new father to a child who is a United States citizen further undermines any fear that he is likely to abscond. In any event, the government will have the opportunity to carry its burden of proving that Destino is dangerous or a flight risk at a bond hearing in Immigration Court, if such concerns exist. See id.

Moreover, the court agrees with other courts that have recognized the "'substantial societal costs,' borne by the public," of immigration detention without bond hearings. Tenemasa-Lema, 2025 WL 3280555, at *10 (quoting Hernandez-Lara, 10 F.4th at 33). When noncitizens are detained, they are ripped away from their families, communities, jobs, and responsibilities. Id. The purposeless detention of noncitizens "removes from the community breadwinners, caregivers, parents, siblings and employees." Hernandez-Lara, 10 F.4th at 33. This disruption confers on the public "intangible," as well as "financial costs." Id. "In fact, limiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention." Id.

In this case, the government does not argue that the cost of providing Destino a bond hearing is unduly burdensome. Indeed, the burden cannot be so great, as courts "generally have found that the cost of providing a bond hearing is relatively minimal." Rincon, 2025 WL 3122784, at *9 (quotation omitted). Thus, in view of both the governmental interest and the public interest, the court finds that the final factor favors Destino, and a bond hearing in which

the government is held to its burden is the constitutional minimum requirement of due process.

See Hernandez-Lara, 10 F.4th at 35.

Conclusion

In sum, each of the Mathews factors favors Destino. His detention without a bond hearing violates his rights under the Due Process Clause. The court thus grants the petition and orders the respondents to provide Destino with a constitutionally adequate bond hearing before an IJ as soon as practicable. Because a bond hearing in this case is required by the Due Process Clause, the IJ has jurisdiction to grant Destino release pending final resolution of his immigration proceedings.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

December 24, 2025

cc:    Counsel of record.